Anthony J. Accardo and Clarice Accardo v. Commissioner. Frank La Porte and Margaret La Porte v. Commissioner.
Accardo v. Commissioner
Docket Nos. 52248, 54245.
United States Tax Court
T.C. Memo 1958-67; 1958 Tax Ct. Memo LEXIS 161; 17 T.C.M. (CCH) 322; T.C.M. (RIA) 58067; April 22, 1958
*161 1. Held, that rents paid by a partnership engaged in gambling operations, for occupancy of premises used in conducting such operation in violation of Illinois law, are deductible as ordinary and necessary business expenses within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939. Commissioner v. Sullivan, et al., - U.S. - (March 17, 1958) followed. 2. Held, that the "revenue" of said partnership from its bookmaking operations for each of the taxable years involved, as shown on its partnership information returns, is understated, and that adjustments thereto should be made. In the absence of reliable records susceptible of verification or audit by normal accounting methods, such adjustments are determined by application of the principle of Cohan v. Commissioner, 39 Fed. (2d) 540. 3. Held, that the "revenue" of said partnership from its operation of gambling "games" for each of the years involved, as shown on its partnership information returns, is not understated and should not be adjusted. 4. Held, that assessment of the liabilities determined against petitioners La Porte and his wife for the year 1948 is not barred by the statute of limitations, *162 by reason of consents extending the period for assessment, which were executed by them and the Commissioner; and that assessment of the liabilities determined against them for the year 1949 is not barred by limitation, because of the application of section 275(c) of the 1939 Code. 5. Held, that an addition to tax for substantial underestimate of estimated tax, under section 294(d)(2) of the 1939 Code, should not be imposed against petitioners La Porte and his wife for the year 1948, because timely payments of estimated tax were made by them, in amounts that were adequate in relation to the tax shown on the return for the preceding taxable year; but that such addition to tax should be imposed against them for the year 1949, because three of the payments of estimated tax in respect of said year were not timely payments made within or before each quarter. Eugene Bernstein, Esq., 77 West Washington Street, Chicago, Ill., for the petitioners in Docket No. 52248. Roman E. Posanski, Esq., for the petitioners in Docket No. 54245. Warren C. Seieroe, Esq., and Gerald W. Brooks, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: These cases, which were consolidated for trial, involve deficiencies in income tax and additions to tax for substantial underestimate of estimated tax, determined by the respondent as follows: Addition to tax
Docket
under sec.
No.
Petitioner
Year
Deficiency
294(d)(2)
52248
Anthony J. and Clarice Accardo
1948
$89,425.30
54245
Frank and Margaret La Porte
1948
32,413.40
$2,007.28
1949
24,723.74
1,395.20
*164 Involved also is a claim of the respondent, made by amendments to his answers in said cases, that additional deficiencies in income tax should be determined, as follows: In Docket No. 52248, additional deficiency of $1,140 for the year 1948. In Docket No. 54245, additional deficiency of $570 for the year 1948; and additional deficiency of $642.50 for the year 1949. Prior to the trial, several of the issues raised by the pleadings were settled by the parties. Consideration will be given to these settlements, in the recomputations of the deficiencies to be made herein under Rule 50. The issues remaining for decision are: 1. In determining the net income of a partnership engaged in gambling operations, of which the principal petitioners were members, should rents paid by it for use of premises in which its gambling operations were conducted in violation of local law, be denied deduction as ordinary and necessary business expenses under section 23(a)(1)(A) of the Internal Revenue Code (1939) on grounds of public policy? 2. Was the "revenue" of said partnership from its bookmaking operations for each of the years involved, as reported on its partnership information *165 returns, understated? 3. Was the "revenue" of said partnership from its operation of various gambling games for each of the years involved, as reported on its partnership information returns, understated? 4. In the case of petitioners Frank La Porte and wife, is assessment of the liabilities determined against them for each of the years involved, barred by the statute of limitations? 5. Also in the case of petitioners Frank La Porte and wife, should additions to tax for substantial underestimate of estimated tax be imposed for each of the years involved, under section 294(d)(2) of the Internal Revenue Code (1939)? Findings of Fact Certain facts have been stipulated. The stipulations, together with the exhibits identified therein, are incorporated herein by reference. Petitioner Anthony J. Accardo (hereinafter called Accardo) and petitioner Clarice Accardo are husband and wife. Also, petitioner Frank La Porte (hereinafter called La Porte) and petitioner Margaret La Porte are husband and wife. Each of these couples filed a joint income tax return for each of their taxable years involved with the then collector of internal revenue for the first district *166 of Illinois. The liabilities determined against the wives resulted solely from having been parties to such joint returns. At all times here material, Accardo and La Porte, together with a third person named John Perry, were co-partners in a partnership known as the Owl Club, which conducted various gambling operations, and which had its principal place of business in Calumet City, Illinois. The respective interests of the partners therein, were: Accardo
50 per cent
La Porte
25 per cent
Perry
25 per cent
The Owl Club filed a partnership information return for each of the years involved with the then collector of internal revenue for the first district of Illinois. The sole business of the Owl Club was the operation of "bookmaking" on horse races, and the operation of various gambling "games" such as dice or craps, roulette and blackjack. Most of these activities were conducted in a so-called "big room" in Calumet City; but there also were from five to seven outlying "stations" where "bookmaking" was conducted, and from which the partnership derived income. All such activities were carried on in violation of the Criminal Code of the State of Illinois. *167 [1]
Facts re Rents Paid on Gambling Premises The Owl Club during the years involved paid rents for occupancy of various premises used in its gambling operations, in the amounts of $2,280 for the year 1948 and $2,570 for the year 1949. In its partnership information returns for said years, it claimed deductions for these rents as ordinary and necessary business expenses. The respondent, in amendments to his answers to the petitions herein, requested that such deductions be disallowed on grounds of public policy, and that additional deficiencies be determined against the petitioners, based on adjustment of the distributive shares of the partners in the net income of said Club. Facts re Bookmaking Operations The Owl Club's "big room" in Calumet City was over 200 feet long and about 75 feet wide. Most of the space was devoted to "bookmaking" activities; but there also was a section which was used for the operation of "games." In the bookmaking section of the room, there was a long table, behind which sat a number of "sheet writers" who accepted bets on horse races. Usually, there were *168 from two to six "sheet writers" operating at the same time, who worked elbow to elbow without any dividers or partitions between them. Behind them were one or more "back men" who watched the operations. On the wall, there were card-board sheets, called "hard cards," which showed by name and number the horses that were running on each particular day, and also the names of the jockeys and the probable odds. A loud speaker system carried announcements from a wire service to which the Owl Club subscribed, concerning the times when the various races commenced at the tracks, the progress of the races, the results of the races, and the odds which were paid at the tracks on successful wagers. Also, just beyond the sheet writers, there were "cashiers" who made payments on winning bets. Usually one cashier handled the pay-outs on wagers written by two sheet writers. The partner John Perry was in charge of the "big room"; and he, together with an assistant, had general supervision over both the "bookmaking" activities and the "games." There were various types of wagers on races, which the patrons could make; and the Club prescribed limitations on the odds which would be paid on successful bets *169 of each type. [2] The Club reserved the right, in its discretion, to reject any wager by any patron; and it also reserved the right to terminate all betting on any horse at any time. Unlike the procedure at public race tracks, where bets of each type are pooled and winning wagers are paid only from these pools without risk of loss to the track associations, the Owl Club had no pools; and it carried the entire risk of loss on all bets which it accepted. It acted in the capacity of a bettor, but it also held the stakes until the outcome of the races was known. *170 The procedure for handling bookmaking wagers was substantially as follows: Each of the "sheet writers" was given a pad of so-called "safety tickets." Each such pad was about 5 inches wide and about 13 inches long; and, in complete form, was made up of a group of 10 white sheets (called "20-line sheets" by reason of the 20 printed horizontal lines and spaces provided thereon), over each of which was an assembly of 20 tickets that partially overlapped one another in shingle fashion. All tickets and sheets comprising each pad were bound together by adhesive on the right-hand edge of the pad, so as to form a unit of 200 tickets with their 10 accompanying 20-line sheets. Each ticket was about 5 inches by 1 1/2 inches; it bore a particular number and letter; and it had a half inch space at the top thereof, on which a wager could be written. This space lay directly over a correspondingly numbered space on the related 20-line sheet; and, when a double-faced carbon paper was inserted under the tickets (as was always done), an impression of whatever was written on the ticket would be made, both on the back of the ticket and also in the correspondingly numbered space of the underlying 20-line *171 sheet. By reason of the shingle fashion in which the tickets were arranged, the lower portion of each ticket overlapped the writing space on the succeeding ticket, so that a wager could not normally be written on the latter until the preceding ticket had either been lifted or removed. The pads of tickets had distinctive colors; and the usual, but not invariable, practice was to supply tickets of only one color to a particular sheet writer during any particular day. The double-faced carbons were inserted in the pads by the "back men," before the pads were delivered to the "sheet writers." Also a cardboard was inserted under each 20-line sheet in the pad, so as to prevent the writing on any particular ticket from being impressed beyond the related 20-line sheet. A patron, in making a wager on a particular race, would go to one of the sheet writers and identify the horse on which he was betting; indicate whether his bet was to "win," "place" or "show"; and state the amount which he was wagering. The sheet writer then would write the bet, with a pencil, in the space provided at the top of one of the safety tickets; receive cash from the patron for the amount of the bet; and then detach *172 the ticket from the pad and give it to the patron. As before stated, the double-faced carbon which lay under the ticket would cause a copy of the sheet writer's notations to appear, both on the back of the ticket, and also in the correspondingly numbered space of the related 20-line sheet which the sheet writer retained. After each group of 20 tickets had been written, the sheet writer would detach from the pad the related 20-line sheet which showed the bets made on said tickets; and he would hand the same, together with the money received on such tickets, to a back man. Also, whenever an announcement was received over the loud speaker system that a particular race had started, or whenever the Owl Club decided that betting on a particular race should be closed, the sheet writer would cancel the next succeeding ticket, by making a notation thereon which would identify the race and the time when the betting thereon was closed. He would then hand such cancelled ticket to a back man. The back men delivered to the "cashiers" the completed 20-line sheets, together with the money, which they received from the sheet writers; and, after the results of a particular race were known, the cashiers *173 would pay to the successful patrons the amounts due on winning tickets. In some instances, a patron might not present his winning ticket for redemption until a day or so later, or occasionally until as long as 5 months after the race was own; and, in such instances, the record thereof was usually held in the Club office. Each cashier, before redeeming a winning ticket, would compare the writing thereon with the carbon impression shown on the related 20-line sheet; and if he found that the writing corresponded, he would make a pencil notation, both on the ticket and on the 20-line sheet, as to the amount purportedly paid in redemption of the ticket. All payments on successful tickets were made in cash. Each cashier was supposed to spindle the winning tickets as they were redeemed; but, when he was busy, such spindling was not always done. In some instances, the partner John Perry would personally make wagers for other persons, pursuant to telephone calls received from the "stations" in respect of wagers which the stations did not wish to accept themselves; and, in each such case, he would go to one of the sheet writers and have him write the ticket, apparently using money advanced *174 by the Owl Club. In other instances, Perry would refuse to accept a particular wager at the "big room"; and would arrange by phone for some other bookmaker to accept it. In the latter case, he would hold the bettor's money until the race was over; and would then handle the settlement, without making any record of the transaction on the Owl Club's records. At the close of each day, each of the cashiers would turn over to the head cashier, all cash remaining on hand, together with all winning tickets and all 20-line sheets in his possession. No record or inventory was kept of the number or identity of the tickets and 20-line sheets which the Club had on hand, either at the beginning or at the end of any day; and also no record was kept of the number or identity of the tickets and 20-line sheets which were issued to any particular sheet writer at the beginning of any day, or of those which were returned by any particular sheet writer, either during or at the end of any day. All receipts and all disbursements of the Owl Club were in cash. This cash was kept in the office safe, under the control of the partner John Perry. The Club had no bank account. From time to time, distributions *175 of profits were made to the partners, which likewise were always in cash; and no record was kept of the dates or the amounts of such distributions. [3] Also, there was no record as to the amount of cash which the partnership had on hand, either at the beginning or at the end of any day; and likewise there was no record either as to the amount of cash issued to any sheet writer or cashier at the beginning of any day, or received from any sheet writer or cashier during or at the end of any day. The redeemed tickets on which pay-outs were made, and their related 20-line sheets, were the Owl Club's primary records of its "ins," "outs" and "gross profits" from bookmaking. *176 Such "ins" represented its total receipts from patrons, as a stakeholder, in respect of wagers which may have resulted either in a win or a loss. The "outs" represented purported pay-outs to patrons; but they did not, in their entirety, represent either expenses or losses of the Club - for, if a horse were "scratched," the "out" represented the return to the bettor of his own stake or wager; and, if the bettor won, the "out" represented the return of his wager, plus his winnings which alone constituted a loss to the Club. The "gross profit," which the Club computed by subtracting the "outs" (total payments to patrons) from the "ins," (total receipts from patrons) represented that portion of its gross receipts as a stake-holder, which it became entitled to retain as its own. Such "gross profit" represented the en bloc gain to the Club from the operation of its "book" during a particular period, without regard to the separate gains or losses on individual wagers. The Club realized its profits by taking advantage of the rule of probabilities, as applied to a large series of transactions. The Owl Club's records for its bookmaking operations show total "ins," total "outs," "gross profit, *177 " and percentage of gross profit to "ins," for the years involved, as follows: 1948
1949
Total "Ins"
$1,847.614.00
$1,657,763.00
Total "Outs"
1,732,321.70
1,530,280.20
Gross Profit
115,292.30
127,482.80
Percentage of profit
6.24%
7.68% For each month of both years, the aggregate of the "ins" exceeded the aggregate of the "outs," to reflect a profit. One of the sheet writers whom the Owl Club employed during the years 1948 and 1949 was a man named Santos Stella; he had been so employed since sometime in 1946. There are records of bets written by him on 212 days in 1948 and 210 days in 1949, all of which were on safety tickets and 20-line sheets, such as those above described. The average number of tickets so written by Stella was from 500 to 600 per day. As in the case of all other sheet writers, some of the wagers which he wrote for both large and small amounts resulted in "wins" for the Club, while others resulted in losses; but, unlike the situation with respect to the other sheet writers, the aggregate result, reflected by Stella's tickets for each of the years 1948 and 1949, was a loss to the Club for each of said years. A summary *178 of the results attributed to the wagers written by Stella, as compared to the results of the wagers written by the other sheet writers, is as follows: Year 1948
Gross
Per Cent
Profit
of Profit
Total "Ins"
Total "Outs"
or (Loss)
or (Loss)
Bets accepted by
$ 445,493
$ 507,308.55
($ 61,815.55)
(13.88)
Santos Stella
Bets accepted by all
sheet writers other
than Stella
1,402,121
1,225,013.15
177,107.85
12.63
Total bets accepted by
$1,847,614
$1,732,321.70
$115,292.30
6.24
Owl Club
Year 1949
Bets accepted by
$ 426,109
$ 458,066.50
($ 31,957.50)
( 7.50)
Santos Stella
Bets accepted by all
sheet writers other
than Stella
1,231,654
1,072,213.70
159,440.30
12.95
Total bets accepted by
$1,657,763
$1,530,280.20
$127,482.80
7.68
Owl Club
The following is an analysis, by months, of the results of the wagers written by Santos Stella in the months that he worked: Days
Financial
Worked
Winning
Losing
Result
1948
in Month
Days
Days
for Month
January
11
4
7
Loss
April
15
6
9
Loss
May
17
6
11
Loss
June
25
9
16
Loss
July
27
10
17
Loss
August
26
14
12
Loss
September
25
11
14
Loss
October
25
12
13
Loss
November
24
10
14
Loss
December
17
6
11
Loss
1949
January
23
7
16
Loss
February
24
6
18
Loss
March
25
8
17
Loss
April
12
3
9
Loss
May
20
12
8
Win
June
26
14
12
Loss
July
26
11
15
Loss
August
27
15
12
Loss
September
25
14
11
Loss
October
2
2
0
Win
*179 The following is an analysis of all bets on which pay-outs of over $100 were claimed to have been made on the 212 days of 1948 and the 210 days of 1949 when Santos Stella worked as a sheet writer: Average
No. of
Number of pay-outs
No. of
sheet
over $100 on such days
days
writers
worked
working
Total for
Attribut-
Stella's
by
on such
all sheet
able to
per cent
1948
Stella
days
writers
Stella
of total
Jan.
11
4.18
22
14
64%
April
15
4.87
109
43
40
May
17
4.47
120
45
38
June
25
4.34
154
82
53
July
27
5.2
225
81
36
Aug.
26
5.0
159
75
47
Sept.
25
4.7
196
106
54
Oct.
25
4.6
235
125
57
Nov.
24
4.2
174
62
36
Dec.
17
3.8
139
62
45
Total
212
1,533
695
45%
1949
Jan.
23
4.5
147
77
52%
Feb.
24
4.0
189
131
69
March
25
5.0
209
120
57
April
12
2.5
63
45
71
May
20
3.6
92
38
41
June
26
3.7
112
55
48
July
26
4.1
152
94
62
Aug.
27
4.1
187
94
50
Sept.
25
4.8
199
111
56
Oct.
2
5.5
15
4
27
Total
210
1,365
769
57%
"Outs" paid on such bets
On bets
Stella's
Total
attributable
per cent
1948
"Outs"
to Stella
of total
Jan.
$ 6,077.00
$ 4,730.35
78%
April
25,206.00
13,738.10
55
May
29,367.05
17,331.60
59
June
38,000.05
24,063.05
63
July
49,041.25
25,481.00
52
Aug.
37,382.70
19,910.55
53
Sept.
43,267.65
26,879.55
62
Oct.
49,068.20
29,476.75
60
Nov.
35,714.40
15,815.85
44
Dec.
31,091.35
16,334.35
53
Total
$344,215.65
$193,761.15
56%
1949
Jan.
$ 30,605.40
$ 20,591.00
63%
Feb.
42,201.85
32,511.70
77
March
43,683.35
30,473.30
70
April
14,057.50
10,214.75
73
May
19,984.90
9,507.10
48
June
22,931.35
13,562.50
59
July
32,723.10
23,044.10
70
Aug.
36,716.30
19,433.40
53
Sept.
38,829.75
24,449.35
63
Oct.
2,205.15
567.20
26
Total
$283,938.65
$184,354.40
64%
*180 The following is a similar analysis of all bets on which pay-outs of $500 or more were claimed to have been made on the days when Stella worked: Number of pay-outs
of $500 or more
No. of
"Outs" paid on such bets
days
Total
worked
for
Attribu-
Stella's
Stella's
by
all
able to
per cent
Total
Attributable
per cent
sheet
1948
Stella
writers
Stella
of total
"Outs"
to Stella
of total
Jan.
11
5
5
100
$ 3,106.15
$ 3,106.15
100
April
15
10
10
100
6,508.90
6,508.90
100
May
17
12
12
100
10,609.45
10,609.45
100
June
25
18
14
78
12,452.20
9,716.40
78
July
27
17
15
88
11,981.05
10,831.35
90
Aug.
26
17
13
76
11,746.30
8,428.30
72
Sept.
25
14
12
86
9,166.15
7,918.15
86
Oct.
25
12
10
83
7,440.40
6,304.00
85
Nov.
24
7
6
86
4,979.00
3,896.50
78
Dec.
17
11
7
64
6,725.05
4,105.80
61
Total
212
123
104
85
$84,714.65
$71,425.00
84
1949
Jan.
23
8
6
75
$ 5,033.95
$ 3,857.75
77
Feb.
24
13
13
100
8,497.30
8,497.30
100
March
25
13
12
92
9,545.95
8,973.95
94
April
12
5
4
80
2,954.45
2,394.45
81
May
20
8
6
75
5,488.90
4,170.10
76
June
26
8
7
87
5,382.00
4,693.80
87
July
26
4
4
100
2,557.50
2,557.50
100
Aug.
27
3
2
67
1,740.00
1,200.00
69
Sept.
25
7
7
100
4,737.70
4,737.70
100
Oct.
2
11
7,247.35
Nov.
3
1,663.15
Dec.
2
1,261.00
Total
210
85
61
72
$56,109.25
$41,082.55
73
*181 An examination of the notations made on certain tickets written by Stella on which large pay-outs were purportedly made, together with an examination of the carbon impressions of such notations on the related 20-line sheets, shows that some of these tickets were either out of place or were missing from the pad at the time when the tickets preceding them were written. Other 20-line sheets carrying carbon impressions of notations written by Stella on tickets in respect of which substantial pay-outs were purportedly made, show that the carbon impressions for such tickets were of different intensity than those for the preceding and subsequent tickets. And in another instance, three adjoining tickets written by Stella on which large pay-outs were purportedly made, were the last tickets on the 20-line sheet; and the carbon impressions of the notations on such tickets were of greater intensity than the impressions for any of the preceding tickets on the sheet. There is no way to determine which, if any, of Stella's tickets were written at the direction of Perry, to cover bets placed from outside the "big room" as above mentioned. In no instance can the identity of any person to whom any *182 pay-out on such tickets was made, be determined. Also, it can not be determined whether any particular pay-out was made on the day when the race was run. At least part of the "outs" attributed to wagers written by Santos Stella for each of the years involved did not represent actual bona fide pay-outs made by the Owl Club; and the "revenue" of said partnership from its bookmaking operations, for each of said years, as reported on its partnership information returns, was understated. Facts re Games The Owl Club operated its gambling "games" in the following manner: All games were played with chips, rather than with coins or currency. A patron first gave a sum of money to one of the Club's "dealers," for the purchase of chips This "dealer" delivered the money to a "box man" who placed it in a locked box, through a slit; and the "box man" then authorized the "dealer" to issue chips to the patron for the money so received. Neither the "dealer" nor the "box man" thereafter had access to any of the money placed in the box. Whenever a patron desired to redeem his chips, he would surrender them to the "dealer" who, after determining the amount thereof, would turn them over to a "box *183 man." Thereupon, the "box man" would write the dollar amount of such chips on both halves of a ticket which was divided by perforations into duplicate upper and lower portions; he would insert the lower half of the ticket into the locked box through the slit, but would retain the upper half; and he then would pay the patron the amount written on the ticket from a "bank roll" with which he was provided at the start of the day. The usual procedure was for the "box man" to have the "dealer" initial the lower half of the ticket that was inserted into the locked box; but this was not done in the following situations: (1) Where the partner Perry was himself acting as box man, as he did on three or four occasions per day to relieve the regular box man; or (2) At the end of the day, when Perry himself redeemed all the outstanding chips; or (3) Where Perry or his assistant were present during the day, and indicated that initialing of the tickets was unnecessary. As regards the upper portion of the tickets which the box man retained until he surrendered his bank roll, these were sometimes initialed by the dealer but in other cases they were not. At the close of each day, all box *184 men turned over their boxes to the Club's head cashier, together with the balances of their bank rolls, and the retained portions of tickets. The partner Perry opened the boxes, in the presence of at least one employee. The amount of cash therein was the Club's "ins" from games for the day; and it represented the total of the day's receipts from the issuance of chips. The total of the tickets in the boxes was the Club's "outs" from games for the day; and it represented the total of the day's disbursements in redemption of chips, irrespective of whether or not the chips redeemed from a particular patron were winnings. And the difference between such "ins" and "outs" was regarded by the Club to be, and was, the amount of its gross profit or loss from games for the day. No record was kept of the amounts won or lost by the Club on separate games or plays; and such amounts are not determinable. The Club retained a set of the "out" tickets from its games, which usually consisted of the upper halves of tickets that were turned in by the "box men"; but which, in some cases, might consist of the lower halves of tickets that had been put into the boxes. The Owl Club derived "revenue" from *185 its "games" in the amounts of $38,895.50 for the year 1948, and of $24,773 for the year 1949. These amounts represented the differences between the gross receipts and gross pay-outs from games in said years. Only a portion of said pay-outs for each year was supported by tickets which bore initials of a "dealer." The absence of a dealer's initials on any of the retained tickets does not, in itself, indicate that the ticket was not bona fide. The "revenue" of the Owl Club partnership from its operations of gambling games for each of the years involved, as reported on its partnership information returns, was not understated. Miscellaneous Facts re Owl Club At the close of each business day, the Owl Club cashier prepared a memorandum record known as a Daily Summary Sheet, showing: (1) The total "ins" and total "outs," respecting bookmaking activities on its own premises, as reflected on the 20-line sheets; (2) the total "ins" and total "outs" respecting bookmaking activities conducted at the outlying stations; (3) the total "ins" and total "outs" with respect to "games"; and (4) various operating expenses paid in cash during each particular day. From such daily summaries, an independent *186 accountant who came to the premises prepared monthly recapitulations; and he also prepared the partnership's information returns of income. This accountant merely used the figures so supplied to him; and there was no method by which he could verify the accuracy of any of such figures. On the partnership's information return for each of the years involved, no items of "gross income" or "deductions" were listed in the spaces provided therefor; but at the bottom of the first page of each return, on the line desigated "Ordinary net income," there was inserted a figure and the notation "see attached statement." Such attached statement showed the following items: "Revenue." Under this heading was listed the total "ins" and total "outs" from bookmaking in the Club's own premises, together with the amount of the difference between the two; the net receipts from "games," without specification of "ins" or "outs"; and "Miscellaneous Income (net)," representing gross receipts less service charges, from the outlying stations. "Total Revenue." This was the aggregate of the above-mentioned items of "Revenue." "Operating Expenses." This consisted of a list of various business expenses, such *187 as wages, rent, telephone and supplies. "Net Profit." This represented the amount of the above-mentioned "Total Revenue" less the amount of the above-mentioned "Operating Expenses." Each return also showed the amounts of the distributive shares of the three partners in the above-mentioned "Net Profit." No item in either return was designated "gross income". A summary of the amounts of the items shown on the statements attached to the partnership information returns for the years involved, is as follows: 1948 Partnership Information Return
Revenue: Bookmaking
Ins
$1,847,614.00
Outs
1,732,351.95
Net
$115,262.05
Games - Net ("ins" and "outs" not
shown)
38,895.50
Outlying Stations: Gross receipts
$ 106,008.70
Less: Service charge
37,597.35
Net
68,411.35
Total Revenue
$222,568.90
Operating Expenses
131,260.95
Net Profit
$ 91,307.95
1949 Partnership Information Return
Revenue: Bookmaking
Ins
$1,657,763.00
Outs
1,530,379.10
Net
$127,383.90
Games - Net ("ins" and "outs" not
shown)
$ 24,773.00
Outlying Stations: Gross receipts
$ 67,361.70
Gross losses
932.70
$ 66,429.00
Less: Service charge
23,916.20
Net
42,512.80
Total Revenue
$194,669.70
Operating Expenses
129,865.46
Net Profits
$ 64,804.24
*188 Facts re Statute of Limitations - La Porte Petitioners La Porte and wife, prior to the expiration of the period of limitation of assessment of income taxes against them for the year 1948 executed with the Commissioner of Internal Revenue a consent (Form 872) extending such period for assessment to June 30, 1953; and, prior to the expiration of the above-mentioned consent, said petitioners and the Commissioner executed a second consent (Form 872) extending the period for assessment of such taxes to June 30, 1954. The statutory notice of deficiency issued to petitioners La Porte and wife for the years 1948 and 1949 was mailed to them on May 18, 1954. No consent (Form 872) was executed by petitioners La Porte and his wife, and by the Commissioner, to extend the period for assessment of income taxes against said petitioners for the year 1949. The statutory notice of deficiency issued to said petitioners for said year was mailed to them more than 3 years, but less than 5 years, after their return for said year was filed. A summary of the income items, gross and net, shown on the joint return of said petitioners for the year 1949, is as follows: Gross rents (50% share)
$ 900.00
Less: Depreciation
562.50
Net
$ 337.50
Partnerships: Owl Club (25% of net
profit per partnership
return)
$16,201.06
Co-Operation Music Co.
(20% interest; no part-
nership return in evi-
dence)
1,559.52
Play House (percentage
of interest not speci-
fied; no partnership re-
turn in evidence)
2,929.23
Penny Arcade (50% in-
terest, no partnership
return in evidence)
211.75
$20,901.56
Less: Business expense
(identity of particular
business not specified)
$ 2,700.00
Net from Partnerships
$18,201.56
Farm: Sale of livestock
$ 3,403.62
Sale of produce
5,812.38
$ 9,216.00
Less: Operating expenses
10,462.83
Net Profit
None
Capital Gains
None
*189 Said petitioners omitted from their gross income for the year 1949 an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in their return for said year. Facts re Estimated Taxes - La Porte Petitioner La Porte filed his 1947 income tax return with the appropriate collector, and showed thereon a total tax of $3,747.87. On March 15, 1948, he filed with the same collector, a declaration of estimated tax for the year 1948, showing an estimated tax of $6,000; and thereafter he made installment payments with respect to the same, as follows: March 15, 1948
$1,500.00
June 15, 1948
1,500.00
September 15, 1948
1,500.00
January 14, 1949
1,145.93
$5,645.93
Each of the above-mentioned payments was a timely payment by said petitioner of estimated tax made within or before each quarter; and was, in each instance (notwithstanding that one payment was slightly less than one-fourth of the estimated tax), "in an amount at least as great as though computed [after all proper adjustments] * * * on the basis of the facts shown on his return for the preceding taxable year," within the meaning of section 294(d)(2) *190 of the 1939 Code. Petitioner La Porte and wife filed their joint return for the year 1948 with the appropriate collector, on February 15, 1949; and they showed thereon a total tax of $5,572.92, none of which was attributable to income of petitioner's wife. On March 15, 1949, petitioner La Porte filed with the same collector, a declaration of estimated tax for 1949, showing an estimated tax of $6,000; and thereafter he made installment payments in respect of the same, as follows: March 15, 1949
$1,500
June 24, 1949
1,500
October 24, 1949
$1,500
February 9, 1950
1,500
None of the above payments, except for the first, was "a timely payment of estimated tax made within or before each quarter," within the meaning of section 294(d)(2) of the 1939 Code. Opinion I The first issue for consideration is whether rents paid by the Owl Club for occupancy of premises used in conducting its gambling operations in violation of Illinois law, are deductible as ordinary and necessary business expenses within the meaning of section 23(a)(1)(A) of the Internal Revenue Code of 1939. This question is one on which, until recently, the Courts expressed *191 differing opinions; and, accordingly, disposition of the instant case was postponed to await possible decision by the Supreme Court of the United States in another case involving such question, in respect of which a petition for a writ of certiorari had been filed and was thereafter granted. On March 17, 1958, the Supreme Court filed its opinion in Commissioner v. Sullivan, et al., - U.S. -, and held therein that, under facts similar to those here involved, the rents were deductible. On authority of the Supreme Court's decision in said Sullivan case, we decide the present issue for the petitioners. II The next issue is whether the "revenue" of the Owl Club from its bookmaking operations for each of the years involved, as reported on its partnership information returns, was understated. Petitioners contend that the records of said partnership correctly disclose its "revenue" from bookmaking operations; and that the Commissioner's action in adjusting such "revenue" by refusing to recognize a portion of the purported pay-outs, is arbitrary and unjustified. We do not agree. It is true that there are records of the partnership which, standing by themselves, indicate that the challenged *192 pay-outs represent payments made to someone in respect of wagers. But such records are no more than evidential; and they are not conclusive. Doyle v. Mitchell Bros. Co., 247 U.S. 179, 187. In Holland v. United States, 348 U.S. 121, 132, the Supreme Court said: "Certainly Congress never intended to make § 41 [of the 1939 Code] a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. * * * To protect the revenue from those who do not 'render true accounts,' the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history." Here, we have a partnership which engaged in "bookmaking" on horse races, on a large scale. In 1948 its gross receipts from wagers on races were more than $1,847,000; and in 1949 they were more than $1,657,000. And for these same years, the amounts which it claims to have been paid out to patrons were $1,732,000 and $1,530,000, respectively. Yet, notwithstanding these large amounts, the partnership's only records of its bookmaking operations were: (1) Certain wager *193 tickets, on which there were penciled figures purporting to indicate the receipts and payouts; (2) related 20-line sheets, containing carbon impressions of the writings on said tickets, and other penciled notations of purported pay-outs in connection therewith; and (3) various summaries or recapitulations of the figures reflected on said tickets and 20-line sheets. The accountant who compiled monthly summaries of the partnership's operations and prepared the partnership returns, testified that he worked entirely from the figures shown on the Club's own summaries which were supplied to him; and that he did not, and had no way to, verify any of such figures. As set forth in our Findings of Fact, all receipts and disbursements of the business were in cash; and all cash used in the business was kept in the office safe under the control of the partner John Perry. There was no bank account to which reference could be made to determine deposits or withdrawals. Also, there was no cash journal and no cash control account of any kind, from which a determination could be made as to the cash position of the partnership on any day, or as to any day-to-day increase or decrease in such cash position. *194 And, although the partners made cash distributions to themselves in their discretion, no record was kept of the dates or the amounts of such distributions. Also, no balance sheets were shown on the returns, as required; and there was no way to determine how much capital or undivided profits were employed in the business. The accountant testified that he never checked the amount of cash on hand at any time. In addition, there was no inventory, record or control of the quantity of tickets and 20-line sheets on hand at any time; although it was on such tickets and sheets that pencil notations of pay-outs were made. And likewise, there was no record as to the identity of the unused tickets and sheets which were issued to or returned by any sheet writer, either during or at the end of any day. By reason of all the foregoing, we have concluded, and have heretofore found as a fact, that the Owl Club's records were not susceptible of verification or audit by any recognized accounting method. It is our opinion that such situation justifies and requires close scrutiny of all testimony and all other evidence pertaining to the claimed pay-outs. One of the factors in the instant case, which *195 calls for close scrutiny, is the heavy concentration of purported "outs" on bookmaking wagers written by one particular sheet writer, Santos Stella. This man was not a novice, for he had been employed by the Owl Club since some time in 1946. He worked side by side with the other sheet writers at the long table in the "big room." And yet, in each of the years involved, the wagers written by Stella purportedly resulted in a large overall loss to the Club; whereas the wagers written by all the other sheet writers collectively resulted in a large overall profit for each of these same years. An analysis of Joint Exhibit 8-H reveals that such claimed losses were not concentrated in any particular day or month, but were spread throughout the periods involved. For example, the exhibit shows that the total losses attributed to wagers written by Stella exceeded the aggregate receipts from such wagers in every month of the year 1948, and in all but two of the months of 1949; and the exhibit further shows, for example, that for the month of February 1949 the losses attributed to wagers written by him exceeded the gross receipts from such wagers for 18 out of the 24 days on which he worked. *196 The comparative figures for wagers written by Stella and the other sheet writers who worked with him have been set forth in our Findings of Fact, and we shall not repeat them here; but they may be summarized as follows: During 1948 the sheet writers, other than Stella, collectively accepted wagers totaling $1,402,121, which resulted in a gross profit to the Club of $177,107.85, or 12.63 per cent of said wagers; and in 1949 such other sheet writers collectively accepted wagers totaling $1,231,654, which resulted in a gross profit to the Club of $159,440.30, or 12.95 per cent of the wagers - being a variation of less than one-third of one per cent between the two years. However, in the case of Stella, he in 1948 purportedly accepted wagers which totaled $445,493; which resulted in a purported overall loss to the Club of $61,815.55; and which reflected a loss percentage of 13.88 of said wagers. Also for the year 1949, Stella purportedly accepted wagers which totaled $426,109; which resulted in a purported overall loss to the Club of $31,957.50; and which reflected a loss percentage of 7.50. Furthermore, the Club's records reveal that there was attributed to wagers written by Stella *197 a disproportionately large percentage of the total claimed pay-outs of more than $100, and also of the claimed pay-outs of $500 or more. For example, in each of the first 3 months of the year 1948 and in 3 other months of 1949, there was attributed to Stella alone 100 per cent of the pay-outs of $500 or more. In addition, close inspection of several of the wager tickets and 20-line sheets written by Stella, on which large pay-outs were purportedly made, reveal unusual characteristics that justify doubts as to their regularity. [4]
*198 As regards the witnesses who testified on behalf of the petitioners, these included the partner John Perry, the sheet writer Santos Stella, and several employees who had worked at the Owl Club in various capacities during the years involved. Neither Accardo nor La Porte testified; and there is no evidence whatever regarding the amounts of profit which they withdrew from the business. The testimony of the employees, other than Stella, related principally to the methods which the Club had used in its operations; and, although all these witnesses disclaimed knowledge of any irregularities, we are satisfied that their varied employments in the "big room," where there was concededly much confusion, did not provide them with opportunity for close observation of Stella's activities. Perry testified that he had never, during the years involved, made any inquiry or check as to whether the wagers being written by Santos Stella were resulting in losses or wins to the Club. But he attempted to explain the disproportionate amount of "outs" attributed to Stella's work, by stating that it was his practice to direct to this sheet writer any patron whom he believed intended to place a large bet. *199 Likewise, the head cashier testified that it was Perry's practice to send to Stella, patrons who might have inside information on the horses (called "smart-money" bettors) - although Perry did not so testify, and the cashier did not claim that he personally had given directions to any patron. It is significant that, on cross-examination, neither of these witnesses was able to explain satisfactorily how he could determine, in advance, how large a wager any particular patron would make, or whether a particular patron had inside information; or why, after the Club had exercised its discretion to permit a particular patron to place a bet, there could be any difference in result, if such wager were placed with one sheet writer rather than with another. It seems probable that, if the Club had been attempting to concentrate potentially dangerous bets in any one sheet writer, it would have made at least some check on the results of such wagers. Moreover, these witnesses recognized that persons possessing inside information frequently spread their wagers over several small bets, so that identification of either the bets or the bettors was exceedingly difficult. And when any such bettor was *200 identifiable, the Club had reserved the right to reject his wager. As regards Santos Stella, his testimony was both evasive and contradictory; and, in our opinion, it is unreliable. [5] He was unable to explain why the percentage of "outs," attributed to wagers written by him, so greatly exceeded that of his fellow sheet writers; for he testified that "I would just take bets as they come along." At one point, he stated that he had no knowledge of particular bets being directed to him by Perry; but, a few minutes later, he spoke of handling "smart money"; and then, shortly thereafter, he disclaimed any knowledge of "smart money" having been sent to him. *201 Stella acknowledged that some of the wager tickets were loose from the pads when he wrote them, but he claimed that this was due to faulty manufacture of the pads; and he stated that, before writing such loose tickets, he would call upon Perry to initial them. However, a few minutes later, when pressed regarding such initialing, he switched his position and claimed that he could not remember. None of the questioned tickets that are in evidence bear initials. Stella was questioned also regarding the variations in the carbon impressions on certain of his 20-line sheets. He purported to be unable to recognize such variations on the sheets exhibited to him; but he suggested that they might have been caused by his using one pencil for the questioned tickets, and by his using another pencil for both the preceding and the succeeding tickets. Such explanation appeared to us to be strained, and is not regarded to be credible. It is our opinion, after seeing and hearing all the witnesses, after viewing the demonstration made in the Courtroom with respect to the wager tickets and 20-line sheets written by Santos Stella, and after carefully considering and weighing all the other evidence, *202 that the testimony of Stella, as a whole, should be rejected as not worthy of belief; and that credibility should be denied also to those portions of Perry's testimony in which he disclaimed knowledge that Stella's wagers were continuously resulting in disproportionate amounts of purported loss to the Owl Club, and in which he disclaimed knowledge of any irregularities. Also we are convinced, from all the foregoing, that the Owl Club's records of wagers written by Santos Stella are not reliable; that part, though not all, of the purported pay-outs made with respect to such wagers do not represent actual, bona fide pay-outs by the Club; and that both the Club's "revenue" with respect to these particular wagers and also its "revenue" from bookmaking operations as a whole, as shown in its partnership information returns, are understated. In the circumstances here present, we have concluded that a reasonable adjustment of the Owl Club's reported "revenue" from its bookmaking operations should be made. Accordingly, applying the principle of *203 Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2), we hold that the amounts of "revenue" of the Owl Club from its bookmaking operations for each of the years 1948 and 1949, should be adjusted in such manner as to attribute to the wagers written by Santos Stella in each of such years the same percentage of profit as was attributed by the Club to the wagers written collectively in those years by the other sheet writers who worked at the same time as Stella. Thus, based on the schedules set forth in our Findings of Fact, we hold that the Owl Club should be charged with "gross profit" in respect of the wagers written by Stella in 1948, of 12.63 per cent of the total "ins" from such wagers; and with "gross profit" in respect of the wagers written by Stella in 1949, of 12.95 per cent of the total "ins" from such wagers. These profits shall be in addition to the other profits reflected on the partnership records in respect of wagers written by sheet writers other than Santos Stella. No adjustment shall be made in respect of any of the "Operating Expenses" claimed as deductions on the partnership information returns, except for the stipulated adjustments mentioned in paragraphs *204 6(c) and 7(c) of the stipulation of facts. III As regards the "revenues" reported by the Owl Club from the operation of its gambling "games" in each of the years involved, we find no cause in the evidence for any adjustment of the same. Here, unlike the situation with respect to the bookmaking operations, there is no indication that a disproportionate amount of "outs" was attributed to any one "dealer"; and we regard none of the testimony regarding the games to be unworthy of belief. Also, we are satisfied from the evidence, that the initialing of tickets was not required or practiced in all cases; and that the absence of initials on a ticket does not, in itself, establish that the amount of the ticket was not actually paid out in the redemption of chips. We hold for the petitioners on this issue. IV Petitioners La Porte and wife have contended that assessment of the liabilities determined against them for each of the years involved is barred by the statute of limitations. As regards the year 1948, we hold that assessment of the liabilities is not barred. As shown in our Findings of Fact, the notice of deficiency was issued to them within the period of assessment for 1948, *205 which they and the Commissioner had mutually agreed upon in duly executed consents (Form 872). As regards the year 1949 also, we hold that assessment of the liabilities determined against these petitioners is not barred by limitation, because of the application of section 275(c) of the 1939 Code. [6] We have heretofore found as a fact, that the notice of deficiency was issued to them more than 3 years, but less than 5 years, after their return for said year was filed; and that said petitioners omitted from their gross income for said year an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in their return. *206 The several amounts of gross income which said petitioners reported in their 1949 return have been set forth in our Findings of Fact; and likewise, the amounts of "Revenue" reported by the partnership on its information return for said year have been set forth. We have employed these figures in reaching our conclusion; and we also have given effect to the implied concession made by respondent in his brief, that there should be deemed to have been included in the gross income stated in petitioners' return, La Porte's distributive share of the Owl Club's gross income as stated in its information return, in lieu of his distributive share of the Club's net income which he actually reported. [7]
We regard to be without merit, the contention of said petitioners that, in determining the "gross income" stated in the Owl Club's partnership information return, there should be employed the total "ins" from the Club's various gambling operations, rather than the "Total Revenue" reported by it. We have heretofore shown in our Findings of Fact that the Club's "ins" for bookmaking did not represent *207 its gross income, but rather its gross receipts as a stakeholder; that portions of such gross receipts were refunded to patrons in all cases where horses selected by them were "scratched"; and that other portions of such gross receipts were in all cases returned to winning patrons as their stakes, along with their winnings which alone represented losses to the Club. As regards the "games," neither the "ins" nor the "outs" were shown on the partnership return. And, in any event, the "ins" from games did not represent gross income, but rather gross receipts from issuance of chips; whereas the "outs" were merely amounts refunded to patrons on redemption of chips, irrespective of whether such amounts represented winnings of the patrons (i.e. losses to the Club), or merely refunds of the patrons' investments in chips. The partnership information return does not separately state the amounts of the Club's winnings and losses, either on the basis of individual wagers or on an annual basis. Rather, such return shows only the total receipts of the Club, as a stakeholder; its total pay-outs, as a stakeholder; and the net difference between such amounts, which the Club, as a successful bettor, *208 became entitled to retain as its own en bloc profit or income for the year. It was from this latter net amount which the Club designated as "Total Revenue," that there were deducted the "Operating Expenses," to arrive at the "Net Profit" used in computing the distributive shares of the partners. If such "Total Revenue" may not properly be regarded as "gross income," then no "gross income" of the partnership was stated on its information returns. In applying the provisions of section 275 (c), we have used the "Total Revenue" reported on the Owl Club's return, in determining La Porte's share of the partnership gross income deemed to have been stated in his return; and we also have used such "Total Revenue," as increased pursuant to stipulations of the parties and pursuant to our holdings under Issue II, in determining La Porte's portion of the partnership gross income omitted from his return. V There remains the question of whether additions to tax for substantial underestimate of estimated taxes should be imposed against petitioners La Porte and wife, for each of the years 1948 and 1949, under section 294(d)(2) of the 1939 Code. This question has been largely disposed of through *209 the Findings of Fact which we have heretofore made in respect of the issue. Section 294(d)(2) provides, in general, for the imposition of an addition to tax for substantial underestimate of estimated tax; but it also provides, in substance, that such addition shall not be imposed if the taxpayer "makes a timely payment of estimated tax within or before each quarter," in an amount at least as great as though computed on the basis of the facts shown on his return for the preceding taxable year, after certain required adjustments have been made. We have heretofore found as a fact that, for the year 1948, La Porte did make timely payments of estimated tax within or before each quarter, which in each instance was sufficient to bring him within the abovementioned exception; but that, for the year 1949, three of the four payments of estimated tax made by him were not timely payments made within or before each quarter, within the meaning of said exception. Accordingly, we hold that the addition to tax provided by section 294(d)(2) should not be imposed against petitioners La Porte and wife for the year 1948, but that such addition to tax should be imposed against them for the year 1949. *210 Decisions will be entered under Rule 50. Footnotes
1. Illinois Revised Statutes (1945), Chapter 38 (Criminal Code), sections 325 and 336.↩
2. The odds paid on winning wagers were the same as those paid at the tracks, except for the limitations hereinafter stated: A Win bet was one that the horse wagered on would come in first. The odds on such bets were limited by the Owl Club to 30 to 1 on the first $10 wagered, and 15 to 1 on any excess over $10. A Place bet was one that the horse would come in first or second. The odds on these were limited to 12 to 1 on the first $10 wagered, and 6 to 1 on any excess amounts. A Show bet was one that the horse would come in first, second or third. The odds on these were limited to 6 to 1 on the first $10 wagered, and 3 to 1 on any excess amount. A Daily Double bet was one in which the bettor undertook to select in advance the winning horse in two specified races at a particular track, usually the first and second races. The odds on these bets were limited to 100 to 1, without regard to the amount wagered. A Parlay bet was similar to a Daily Double bet, except that it would be made for Win, Place or Show, and also could be made on two or more races at the same or different tracks. Like Daily Double bets, the horses had to be selected in advance; and all had to Win, Place or Show, depending on how they were bet to finish. On such bets there was an overall limitation on odds of 100 to 1, with specific limitations of 15 to 1, 6 to 1, and 3 to 1. In case a particular horse was "scratched" (withdrawn from a race) after a wager on him had been made, refund of the amount wagered would be made to the patron upon surrender of his ticket.↩
3. Distributions to partners were made at irregular intervals, whenever Perry believed that the amount of cash on hand exceeded that needed in the business. Perry approtioned such distributions among the partners, in accordance with their interests; and he delivered the shares of both Accardo and La Porte to the latter, who took away the cash representing them, either in his pocket or in a paper bag. Perry "put away" his shares. without ever depositing them in a bank. No receipts for such distributions were ever given.↩
4. At the hearing, the respondent presented two witnesses who had made detailed examinations of the tickets and 20-line sheets written by Santos Stella; and they testified regarding the results of their examinations. One of these witnesses conducted demonstrations in the Courtroom. By placing a sheet of clear plastic over certain of the 20-line sheets, making tracings on the plastic of the carbon impressions shown on said sheets, and then inserting the related tickets under such tracings, he was able to show the exact position of the tickets at the time they were written. He then examined the impressions made by the double-faced carbon, both on the back of these tickets and on the back of the adjoining preceding tickets; and by such means he demonstrated, to the satisfaction of the Court, that certain of the tickets had not been in their normal position when the tickets preceding them were written. Also it was demonstrated at the hearing, to the satisfaction of the Court, that the carbon impressions on certain of the 20-line sheets written by Stella, which reflected large payouts, were of different intensity than the impressions for both the preceding and subsequent adjoining tickets. It was suggested that this resulted from the use of a differen carbon paper. Respondent has contended, on the basis of such demonstrations, that some of Stella's tickets were detached from the pads, and were written after the results of the races were known. He has further contended that indications of such alleged manipulation could be detected only in a few instances, where the writing of the tickets or the impressions of the carbon were other than normal.↩
5. Stella did not appear as a witness at the original trial; but only at a supplemental hearing which was had, at the request of petitioners, about 7 months after the trial and after the principal brief for the respondent had been filed. He had been subpoenaed by respondent to appear on an earlier trial date which had been postponed; and he had been advised by letter of the later trial date. But when his testimony was desired, he could not be found by either party. During his cross-examination, it was developed that, during most of the trial, he had occupied a hotel room which was only a short distance from the Court, and had there been in contact with counsel for one of the petitioners. But that, shortly before he was to appear as a witness, he had departed from the hotel, allegedly on account of illness; and had left no word as to where he could be found. His explanation as to his whereabouts were [was] indefinite and evasive.↩
6. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
7. The above concession is in accord with Revenue Ruling 55-415, 1955-1 C.B. 412↩.